# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| TAMMY WALEN, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 6570 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Tammy Walen (incorrectly docketed as Tammy Walen (Dkt. # 1)), seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Walen asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.[1]

### I.

Ms. Walen applied for DIB on September 21, 2010, alleging that she has been disabled since June 10, 2010, due to heart problems and a thyroid condition. (Administrative Record ("R") 187-93, 204). After her application was denied initially and upon reconsideration, she appeared before an administrative law judge for a hearing on her claim on January 25, 2012. (R. 51-88). Ms. Walen

---

[1]Ms. Walen also asks that the Commissioner be ordered to pay her $14,751.00 she claims the Social Security Administration owes her. (Dkt. # 32-1, at 3). The argument is undeveloped and unexplained, supported only by a notice that Ms. Walen, for whatever reason, repaid benefits to the Social Security Administration or returned checks that the Administration sent to her. (Dkt. #30-1). There is absolutely nothing to suggest that any benefits are owed to Ms. Walen and so this argument is rejected.

was represented by counsel at her hearing; in addition, Ellen Rosenfeld, a psychologist, testified as a medical expert and Thomas Dunleavy testified as a vocational expert. (R. 52).

On April 26, 2012, the ALJ determined that Ms. Walen's was disabled and unable to perform any work from June 10, 2010, until August 22, 2011, as a result of Grave's disease, hyperthyroidism, anxiety, and depression. (R. 37, 41). But the ALJ also found that, as of August 23, 2011, Ms. Walen experienced medical improvement and was no longer disabled. As of that date, she was able to perform a limited range of light work, that involved only simple, routine, repetitive, and predictable tasks; did not involve more than occasional contact with supervisors; involved only incidental contact with the general public; and did not involve undertaking any shared tasks with co-workers. (R. 43). This allowed Ms. Walen to perform jobs like housekeeper/cleaner, cafeteria attendant, and laundry sorter, all which existed in significant numbers in the regional economy. (R. 45). The ALJ's decision became the Commissioner's final decision on July 17, 2013, when the Appeals Council denied Ms. Walen's request for review. (R. 1-6). See 20 C.F.R. §§404.955; 404.981. Ms. Walen's appealed that decision by filing suit in this Court under 42 U.S.C. §405(g), and both parties consented to jurisdiction pursuant to 28 U.S.C. §636(c).

## II.

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402

U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It has also called this requirement a "lax" one. *Berger*, 516 F.3d at 544.

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether

a plaintiff is disabled:

   1) is the plaintiff currently unemployed;

   2) does the plaintiff have a severe impairment;

   3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

   4) is the plaintiff unable to perform his past relevant work; and

   5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

### III.
### ANALYSIS

#### A.

Ms. Walen was born on May 16, 1965, making her forty-six years old at the time of the ALJ's decision. (R. 54). She has a bachelor's degree in psychology. (R. 54). She most recently has worked as an apprentice and journeyman tilesetter until about 2007 (R. 55, 57), and prior to that as a receptionist. (R. 55-56). As a tilesetter, she made about $60,000 a year. (R. 64). When she was laid off from that job in 2007, she received unemployment benefits for two years. (R. 58). Then

4

she applied for disability benefits. Ms. Walen explains that she was sick the whole time she was on unemployment benefits but didn't know it. (R. 58). She thought she was tired and depressed because she was unemployed and her mother was dying or cancer. (R. 59).

Ms. Walen knew something was wrong when she began experiencing rapid heartbeats – 130 or 140 beats per minute – out of a sound sleep. (R. 59). She was diagnosed with hyperthyroidism and put on a thyroid and a heart medication. (R. 59-60). But she was given too high a dose because she was so thin – 105 pounds at the time. (R. 60). She was unable to take care of herself. (R. 61). Doctors tried to adjust her medication, but it was a struggle. (R. 61-63). Certain types of treatment weren't available to her because she had no insurance. (R. 65).

Ms. Walen testified that she was achy every day. And overstimulated. IT was hard for her to do basic things like dust or wash dishes. She didn't want to be sick, she wanted to get better and work. Her former colleagues made $94,000 last year, and she made zero. (R. 64). Her son's girlfriend does a lot for her: goes through the mail, balances the checkbook, washes dishes, does laundry, grocery shops. (R. 65). Ms.Walen said she was like a recluse, leaving the house only to see her therapist, which she forced herself to do. (R. 66). She couldn't sleep properly and had no ability to concentrate. (R. 69). Reading was overwhelming. (R. 70-71).

Ms. Walen was taking Cymbalta and didn't feel too unhappy. Doctors wanted to increase her dosage but she could not afford it. So, she was achy, cranky, and miserable. (R. 68). Some days were not as bad as other and she could shower and prepare food. She might only have three or four good days a month. (R. 71). Ms. Walen explained that she had pills for everything – to go to the bathroom, to move around, etc. – and they all had side effects and she couldn't afford them all. (R. 79). She really wanted to get better; to be a normal person. (R. 79).

**B.**

The ALJ found that Ms. Walen was disabled from June 10, 2010, through August 22, 2011, so the issue is her condition from August 23rd on. There is very little medical evidence in the record, one way or the other, pertaining to that period. The ALJ relied heavily on, really, just two reports from two doctor visits on August 22, 2011 and September 7, 2011:

> The claimant's condition improved significantly in beginning in early July 2011. She started taking Cymbalta on July 7, 2011. By August, 2011, the claimant reported that she was much improved and more active. She stated that the medication helped with the body aches; caused her to feel less "loopy"; and made it so that she felt comfortable doing things such as shopping in stores and driving a car.

(R. 39 (citations to the record omitted)).

The record reveals that on July 9, 2011, Ms. Walen was suffering from increased fatigue, and was upset and depressed a lot. (R. 443). As the ALJ indicated, the doctor's clinical note from August 22, 2011, quoted Ms. Walen as saying she was much improved on Cymbalta and was more active – "shopping/ driving." (R. 442). On September 7, 2011, as the ALJ indicated, Ms. Walen reported that the Cymbalta helped her body aches and she felt less "loopy." (R. 476).

But that same day, Ms. Walen further reported that her fatigue had not improved much at all. She wanted to feel more like herself and do basic things like shower and do housework. She was unable to shower more than two times a week – although previously, she was showering just 2 times a month. She was discouraged with her progress. (R. 476). The ALJ made no reference to the balance of the report, focusing on the "less loopy" comment instead.

In addition, the ALJ ignored the subsequent reports. On August 31, 2011, Ms. Walen complained of weakness, cold intolerance, body ache, fatigue, and that she was not even able to minimally function or enjoy quality of life. (R. 521). On October 10th, Ms. Walen reported that she

6

was concerned with her decreased concentration, and her fatigue and stress. She wanted to "make some progress – in any area." (R. 479). On January 11, 2012, Ms. Walen reported that her body aches had gotten worse (when compared to the progress reported August 22, 2010). She also reported weakness and brain fog. (R. 480).

On January 25, 2012, lab tests revealed that Ms. Walen's thyroid stimulating hormone level (TSH) was 23.340. Normal range being between .450 and 4.5 (R. 533), this indicates significant hypothyroidism. http://www.mayoclinic.org/diseases-conditions/hypothyroidism/basics/tests-diagnosis/con-20021179. Thyroid stimulating immunoglobulin and thyroid peroxidase were also rather high. (R. 533). Again, the ALJ ignored these lab results.

An ALJ cannot simply cherry-pick a couple of positive medical reports from a field of negative reports. *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). She cannot ignore evidence that undermines her decision and focus on evidence that supports it. *Bates*, 736 F.3d at 1099; *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). But that's what the ALJ did here and that necessitates a remand.

The Commissioner argues that the ALJ did not ignore these reports, explaining that although the ALJ did not mention any of the reports, she did note Ms. Walen's reports of fatigue to her physicians. (Dkt. # 39, at 8). But what the ALJ said was that she considered Ms. Walen's "*past* reports of fatigue . . . ." (R. 44). The ALJ's theory is that Ms. Walen was much better when she started taking Cymbalta, so it seems the ALJ was talking about reports before that. Moreover, after going on Cymbalta, Ms. Walen reported not only fatigue, but body aches, weakness, stress, concentration difficulties, and brain fog. The ALJ makes no reference to any such complaints. There is simply nothing in the ALJ's decision to suggest that she considered the several negative reports

7

after August 22, 2010.

Grasping at straws to support the ALJ's neglect of all the negative reports, the Commissioner goes so far as to mischaracterize the record – a tactic unworthy of any litigant, but especially unfortunate coming from the government. *See United States Dep't of Hous. and Urban Dev. v. Cost Control Mktg. & Sales Management of Va., Inc.*, 64 F.3d 920, 925 (4th Cir.1994) ("a lawyer's duty of candor to the court must always prevail in any conflict with the duty of zealous advocacy"); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 458 (4th Cir.1993) ("the lawyer's duties to... advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit"); *Beam v. IPCO Corp.*, 838 F.2d 242, 249(7th Cir.1988)(lawyers have a duty of candor to the tribunal).

The Commissioner claims that the September 7, 2011 report states that Ms. Walen said she "felt more like herself and was able to shower regularly, was more focused, and was able to balance her checkbook; and that she could go outside the house and was able to do housekeeping chores, such as dusting, washing dishes, and doing laundry." To the ALJ's credit, she did not claim Ms. Walen said any of these things because she didn't. She said these were her *goals* (R. 478), which means she was unable to do any of them. That doesn't sound like a person who was so medically improved that she could hold down a full-time, light-work job.

So, a remand is required, but it is worth making a point about the ALJ's credibility assessment. In assessing Ms. Walen's credibility, aside from the couple of Cymbalta reports, the ALJ also looked to Ms. Walen's activities. Again, the ALJ concerned herself with Ms.Walens's activities post-August 2011. (R. 42-43). The ALJ relied on the fact that Ms. Walen drove herself to a consultative exam after August 23, 2011, but acknowledged that Ms. Walen testified at her

8

hearing that her son's girlfriend helped her with things like cooking, laundry, and shopping. (R. 42). Elsewhere, the ALJ noted – again focusing on a single Cymbalta report – that Ms. Walen was more comfortable shopping and driving. (R. 43). The ALJ found Ms. Walen not credible and, in fact, that she was only mildly limited in her activities of daily living. (R. 42, 43).

That's not very much to go on, especially given the fact that the ALJ gave very short shrift to Ms. Walen's hearing testimony. In evaluating a claimant's daily activities, an ALJ has to take into consideration the limitations attendant to those activities, like assistance, breaks, etc. *See Sambrooks v. Colvin*, 566 Fed.Appx. 506, 510 (7th Cir. 2014)(in discussing daily activities, ALJ may not omit "qualifications"); *Hamilton v. Colvin*, 525 Fed.Appx. 433, 438 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Here, the ALJ seemed to pay little attention to Ms. Walen's testimony. She had a few good days a month where she could cook. She couldn't shower regularly, She couldn't even go through her mail. She needed quite a bit of help from her son's girlfriend. The ALJ seemed to discredit this help factor, based on the evidence relevant to the pertinent period. So again, this means reliance on just a couple of positive reports and neglect of the negative ones. That was inappropriate.

Curiously, the jobs the ALJ determined that Ms. Walen could do were housekeeper, laundry sorter, and cafeteria attendant. (R. 45). Yet, Ms. Walen testified that she was able to do little or no housework, cooking, or laundry. Especially not without her son's girlfriend's help – which, of course, she would not have on the job. *See Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014)(plaintiff's report of her daily activities differed substantially from the jobs the ALJ found her capable of performing). The fact that Ms. Walen drove to her consultative exam means little. As she noted to the consultative examiner, it was a required part of her application process and

9

happened one time.

One further concern: the ALJ based her RFC finding on the testimony of the medical expert, Ellen Rosenfeld. (R. 44). She is not a medical doctor, but a psychologist. As such, she is not an expert on thyroid conditions – the dominant condition in Ms. Walen's life. In her testimony, the medical expert necessarily had to point to something other than her own expertise to arrive at an assessment of Ms. Walen's physical capacity for work:

> There is records [sic] in 13F from Dr. Ansari, who completed an RFC and though it was really physically based, he did indicate unlimited to good-to-fair work related ability. So there were no significant work related restrictions noted, but again it was mainly physical.

(R. 82). Looking at Dr. Ansari's report, however, it's difficult to fathom what the medical expert had in mind.

Dr. Ansari noted that Ms. Walen's pain was such that it would interfere with her attention and concentration *75% of the day*. (R. 427). She was incapable of even low stress jobs. (R. 428). Her symptoms precluded her from sustaining full-time competitive employment. (R. 428). She was not even able to hold down a part-time job. (R. 428). It was medically reasonable to expect that she would have to lie down during the day. (R. 429). Fatigue would interfere with her ability to work as well. (R. 429). She would likely miss work four times a month or more. (R. 429). How this translates to "unlimited to good-to-fair work ability" is a mystery. But as the ALJ adopted the medical expert's testimony, it's a mystery that infects the ALJ's decision and undermines it. As a result, the ALJ's RFC finding is not supported by substantial evidence.

The Commissioner points out that Dr. Ansari's opinion stated that Ms. Walen's disability was not expected to last more than twelve months and that the ALJ's finding that Ms. Walen was

10

disabled from June 10, 2010, through August 22, 2011, is consistent with that timeline. (Dkt. # 39, at 9). That thinking, of course, requires reliance on the theory that Ms. Walen was fine based on the two Cymbalta reports, which in turn requires turning a blind eye to the negative reports that followed. Dr. Ansari may have been positive regarding Ms. Walen's prognosis in May 2011, but as it turns out, she did not consistently progress the way he and his patient hoped.

## CONCLUSION

The plaintiff's motion for remand [Dkt. # 32] is GRANTED, and the Commissioner's motion for summary judgment [Dkt. #38] is DENIED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

DATE: 11/24/14